[No. 42638.    En Banc.    May 31, 1973.]

RAYMOND T. HOCKLEY, *Respondent*, v. JOE E. HARGITT *et al.*, *Petitioners*, THE STATE OF WASHINGTON, *on the Relation of King County, et al., Respondents.*

338

*Jackson, Goldmark, Bender, Anderson, Whelan, Brotman & Leed* and *Roger M. Leed,* for appellants.

*Christopher T. Bayley, Prosecuting Attorney, William R. Creech, Deputy, Steven H. Chestnut,* and *Keller, Rohrback, Waldo, Moren & Hiscock,* for respondents.

*Slade Gorton, Attorney General, James M. Kennedy* and *Robert J. Wesley,* amici curiae.

BRACHTENBACH, J.—On a September Sunday in 1971 the plaintiff not only bought himself a franchise but, as it turned out, he acquired a lawsuit of staggering complexity. After a single sales presentation, plaintiff agreed to pay $18,000 for a Tacoma franchise to provide the public with a total divorce service by providing legal and financing services. Within a few days he had paid the entire fee, including the delivery of $10,000 in cash.

Within a month, second thoughts—as well as substantial legal doubts—had set in and a flurry of legal activity began with plaintiff's two lawsuits against 14 defendants.

At this stage of this litigation, only procedural issues are before us. The substantive merits have yet to be reached. The petitioners, defendants Hargitt and Divorce, Inc., seek review, by writ of certiorari, and allege 19 assignments of error, contending that the trial court erred in 13 separate matters. Though limited to procedural questions, the parties cite some 20 statutes, 12 court rules and 67 cases to support their respective positions.

Before examining the procedural steps which cause this review, a brief summary of plaintiff's complaint is appropriate. Plaintiff alleges that he purchased from one or more of the numerous defendants a franchise to be operated in the state of Washington, under the name Divorce, Inc. He

asserts that the purpose and function of the franchise would be to provide to the public a total divorce service which would expedite the acquisition of a divorce by providing legal and financing services. He paid $18,000 for his franchise.

With that background, we set forth the sequence of events.

(1) October 29, 1971: Plaintiff, as an individual, sued the named defendants alleging claims bottomed on: (a) fraud; (b) negligent misrepresentation; (c) consumer fraud under the Consumer Protection Act, RCW 19.86; (d) civil conspiracy.

(2) October 29, 1971: Plaintiff, in a class action on behalf of himself and all persons similarly situated, sued the named defendants on the same grounds as in (1) above.

(3) October 29, 1971: Plaintiff secured a temporary restraining order restraining defendant Hargitt and defendant Wasserman from conducting the business of Divorce, Inc., within the state of Washington, and ordering Hargitt and Wasserman to personally appear and show cause why the temporary retraining order should not be made permanent. Plaintiff posted a $1,000 bond in accordance with the order of the court commissioner.

(4) November 8, 1971: On the show cause date, defendants Hargitt and Divorce, Inc., appeared through counsel and by stipulation the show cause hearing was continued until the next day, November 9, 1971.

(5) November 8, 1971: Defendants moved to quash the temporary restraining order and sought a $500,000 bond. By stipulation the temporary restraining order was continued in effect until the hearing on the next day.

(6) November 8, 1971: Plaintiff obtained an order that defendant Hargitt should appear personally at the show cause hearing on November 9th.

(7) November 9, 1971: At 9:30 a.m. the King County Prosecutor served the defendants' attorney with a complaint in intervention on behalf of King County and a

notice of presentation, setting the motion for leave to intervene at 1:30 p.m. on the same day. That motion was granted on that date.

(8) November 9, 1971: Defendant Hargitt filed two affidavits, referred to hereafter.

(9) November 9, 1971: At 1:30 p.m. arguments on all of the motions were heard and argument continued until November 10, 1971.

(10) November 9, 1971: State Attorney General appeared amicus curiae.

(11) November 10, 1971: Plaintiff moved for a contempt order for failure of Hargitt to appear as ordered.

(12) November 10, 1971: After extensive argument the trial court granted the following relief: (a) motion to quash the restraining order and order to show cause was denied; (b) defendant Wasserman's motion to dismiss was denied; (c) King County Prosecuting Attorney's motion for intervention was granted; (d) the motion to hold defendant Hargitt and Divorce, Inc., in contempt and to limit further proceedings on their behalf was granted in part. Defendant Hargitt was ordered to personally appear in Seattle for discovery proceedings within 30 days but further ruling on the motion for contempt was stayed subject to reassertion by the plaintiff upon defendants' failure to comply with the terms of the order; (e) motions for a preliminary injunction were granted. Defendants were restrained from engaging in any acts calculated to solicit future purchasers of the franchise of Divorce, Inc., from advertising for the purchase of franchises, from distributing to individuals and the public any and all materials relating to the operations of Divorce, Inc., Universal Divorce Financing Limited and Universal Legal Services Corp., from carrying on all activities relating to the starting up of franchises of Divorce, Inc., and from any and all publication or advertising relating, either directly or indirectly, to the facilitation of obtaining or assisting in the procurement of a divorce in the state of Washington; (f) the defendants were ordered to pay into court all money collected from Washington resi-

dents for the purchase of franchises of Divorce, Inc., within 60 days from date of order or 10 days before final hearing on the merits, whichever period is shorter, to be held pending further order of the court; (g) the existing bond posted by the individual plaintiff remained in effect, with no bond required of the intervenor.

(13) November 15, 1971: Defendants moved for reconsideration and vacation of the temporary injunction, based on 18 alleged errors.

(14) November 18, 1971: Defendants moved to increase plaintiff's bond to $150,000.

(15) November 23, 1971: The trial court reheard the entire matter and made minor modifications in the order entered on November 10th.

(16) November 30, 1971: The trial court signed a formal order denying the motion to vacate, denying the increased bond and setting forth the minor modifications ruled on in the November 23rd hearing.

(17) January 11, 1972: Motions to intervene by two other franchise purchasers were granted.

From the foregoing activity the petitioners make 19 assignments of error which we group into six major issues. However, before considering these contentions, we must examine the evidentiary matters before the trial court which arise from the affidavit of the plaintiff, plus those of three other franchise purchasers. Plaintiff's affidavit stated: (1) that in September, 1971, he responded to an advertisement for a business opportunity which appeared in a Seattle newspaper, representing that an individual could earn up to $55,000 per year by investing in the defendants' enterprise; (2) that one of the defendants made a sales presentation to him "proposing my purchase from his principals of a franchise whose purpose and function would be to provide to the public a total divorce service which would expedite the acquisition of a divorce by providing attorney and financing services"; (3) that advertising of the services would be a primary and essential part of the franchise operation, with the defendants to provide the copy for such

advertising; (4) that he purchased the franchise for $18,000, paying $2,000 down. Within a few days Hargitt requested immediate full payment of the $16,000 balance and, on the request of Hargitt, plaintiff gave him $10,000 of it in cash; (5) that he received printed promotional materials from defendants, including packets of various testimonial letters, advertising materials and information sheets for the collection of information relevant to the obtaining of a divorce; (6) that he was assured by the defendants that the operation was without question legal, valid, feasible and likely to be a financial success; (7) that Hargitt represented that the mass media advertising of the services of Divorce, Inc., would undoubtedly serve to raise the prevailing divorce rate in Washington; (8) that Hargitt stated that he had already collected $280,000 from franchisees.

The affidavit of intervenor Kennedy was in substance the same as that of the plaintiff. He, too, paid $18,000 for a franchise covering the downtown Seattle area. He received the same materials, including the same testimonial letters. His affidavit alleges that one of the defendants admitted that he, the defendant, was in fact the author of two of the letters.

The affidavits of the intervenors Wisniewski, purchasers of the Olympia franchise, were likewise substantially the same as the plaintiff's affidavit. They made a cash payment of $9,000 for that franchise and pursuant to direction of defendant Hargitt published an advertisement in the Daily Olympian, the content of which was furnished by Hargitt. In substance it stated as follows: "Divorce is never easy but Divorce, Inc., can make it easier."

The essential allegations of the affidavit of Dennis Cox were similar to that of the plaintiff. He purchased the south Seattle franchise for $18,000. He received the same testimonial letters. His affidavit asserts that his territory was to include Auburn, Washington, which was also included in the Hockley franchise.

Despite the filing of three affidavits by defendant Hargitt, the material allegations of the foregoing affidavits were

uncontradicted. The affidavits did not dispute the allegations of the franchise purchasers, but did allege that the defendants would never publish any advertisements relating to the plaintiff's business or any other person's business which they have reason to believe to be in violation of any of the statutes and that they would operate in compliance with all applicable laws.

Thus at the time of the hearing on the motion for preliminary injunction and at the rehearing, the trial court had before it five affidavits from four franchise purchasers alleging (1) the representations as to the nature of the franchise business; (2) that advertising was represented as a primary and essential part thereof; (3) that payment in several instances was made in cash to the defendant Hargitt; (4) that the proposed operation was represented to be legal, valid, feasible and likely to be a financial success; (5) that defendant Hargitt had collected $280,000 from franchise sales; (6) that two of the "unsolicited" testimonial letters were authored by one of the defendants. Incidentally, the testimonial letters include such comments as "good luck and God speed"; "it is this type of 'pioneering' that has helped make America a great place to live"; "God bless you for the thousands of people who will not have to be financially and emotionally throttled now to get a divorce."

In addition to the advertising materials referred to above, the franchise holders were furnished the following copy:

(Offices throughout Canada and the United States)
"DIVORCE INCORPORATED"
Our Clients Receive . . .
  *The Services of an Attorney
  *The Convenience of Low Monthly Payments
  (As low as $29 per month)
  *No Client Turned Down Regardless of Credit
  *Fast Personalized Service
  *All Inquires Held in Strictest Confidence
For Information and Appointment Please Contact:
"Divorce Incorporated"

622 Securities Building 915½ Pacific Avenue.
Tacoma, Washington 98402
Telephone FU 3-3781
Raymond T. Hockley          Domestic Service Consultant
Copyright 1971 by Universal Divorce Financing Ltd.

The defendants first attack the validity of the temporary restraining order and order to show cause. When plaintiff filed his complaint, he also moved for a temporary restraining order and an order to show cause, based on his affidavit and that of his attorney. The attorney's affidavit, stated to be on firsthand knowledge, alleged that he had reason to believe that the defendants were about to publish advertising in Seattle newspapers to advertise and promote the obtaining of divorces through the plaintiff's franchise, placing the plaintiff in criminal jeopardy for violation of RCW 9.04.020 and 9.04.050. Further, it was alleged that such advertisements would place the plaintiff in jeopardy for civil damages under the Consumer Protection Act. It was alleged that the defendant Hargitt resides in Canada and that the defendant Wasserman could not be located in Seattle. It was alleged that irreparable harm would result if the restraining order was not issued. Plaintiff's own affidavit alleged that the advertising and franchises are fraudulent, false, misleading and deceptive in violation of the Consumer Protection Act and in violation of RCW 9.04.050 and that he has incurred substantial damage.

■    Petitioners contend that plaintiff in obtaining the temporary restraining order failed to comply with the King County local rule 65(b)(1) which requires notice of such request to the opponent or his counsel and a showing of good cause if such notice is not given. Further, violation of CR 65 is urged for failure (1) to endorse the order with the date and hour of issuance and (2) to define the injury and state why it is irreparable and why the order was granted without notice. We agree that the plaintiff failed to comply with the applicable rules, especially as to the requirements of CR 65. However, petitioners did not move to quash the temporary restraining order until the very day of its expir-

ation. At that point the issue was moot. Attacking the order at the time of its expiration came too late. It is true that the parties stipulated for continuation of the restraining order for 1 day, without prejudice, but that does not alter the fact that the motion to quash was not made until the restraining order had reached its own termination by its explicit terms. That such moot issue will not be considered is established under the comparable federal rules. *In re California Lumber Corp.*, 24 F.R.D. 190 (S.D. Cal. 1959); *Benitez v. Anciani*, 127 F.2d 121 (1st Cir. 1942), *cert. denied*, 317 U.S. 699 (1943).

■ Petitioners concede that the issue of quashing the temporary restraining order is moot but contend that their right to recover on the bond is still viable if the order was improperly issued. No argument beyond the assertion of the conclusion itself or authority therefor is made or cited. We, therefore, will not consider the point. *In re Cassel*, 63 Wn.2d 751, 388 P.2d 952 (1964), and cases cited therein.

■ The second issue involves defendants' contention that a $1,000 bond was inadequate and the result of arbitrary and capricious action by the trial court. Petitioners originally sought a bond of $500,000 but subsequently moved for a bond of $150,000. The only supporting affidavit is from defendant Hargitt who alleged that Divorce, Inc., has a sizable investment in supplies, that it would have been earning a percentage of the franchisees' volume if the injunction had not been issued, that the franchisees are losing money and that Divorce, Inc., and its franchise holders have suffered great and irreparable damage, totalling at least $100,000 for Divorce, Inc., and at least $50,000 for the franchise holders. The able trial judge did not issue the order and preliminary injunction in any hasty manner. He listened to extensive and repeated arguments—arguments which transcribe into a statement 172 pages in length. The setting of a bond is a matter solely within the discretion of the trial court, RCW 4.44.470; *Greive v. Warren*, 54 Wn.2d 365, 340 P.2d 815 (1959). We cannot find that it abused that discretion in this case, particularly in view of

the abbreviated affidavit of Hargitt which contained only broad allegations and no specifics to warrant a larger bond.

The third major point is the propriety of allowing intervention by King County, coupled with the ruling that the county need not post a bond. On the morning of November 9, 1971, the King County Prosecutor served on defendants' counsel a complaint in intervention and later in the day served a motion to intervene and notice of presentation on the same day. The complaint in intervention was based on RCW 9.04 and prayed for injunctive relief. While the prosecutor's complaint alleged a violation of RCW 9.04.020 (advertising divorce business), his standing is necessarily limited to the alleged violation of RCW 9.04.050 (false, misleading, deceptive advertising) since his authority to proceed is contained in RCW 9.04.060. That statute limits his authority to restraining and preventing violations of RCW 9.04.050 through 9.04.080, and therefore does not connect him with RCW 9.04.020.

Petitioners contend that the prosecutor failed to comply with the civil rules in three respects: (1) that the motion did not state the grounds for intervention as required by CR 24(c); (2) that it was not served on all *parties* (not just their attorneys) (CR 24(c) and CR 5); and (3) that it was not served 5 days before the hearing as provided in CR 6(d).

While the motion for intervention did not state the grounds for intervention, the accompanying complaint set forth the alleged violation of a specific statute and the specific statutory authority by which the prosecutor was proceeding. The defendants have made no claim of prejudice by failure to repeat in the motion the specific grounds alleged in the complaint. We do not want to encourage noncompliance with the court rules, but dismissal of the intervention on this ground would serve no purpose where the defendants have not been misled or prejudiced. Petitioners further argue that CR 5(a) requires service upon the *parties* rather than their counsel if the pleadings assert new or additional claims for relief. That portion of CR

5(a) is limited to parties in default for failure to appear. Plaintiff's complaint had already alleged that this advertising scheme was illegal. The county's complaint in intervention merely specified the particular statutes under which it was proceeding. Service on the parties was not necessary in view of service upon their attorneys of record.

The petitioners are correct that they were not given the 5 days' notice required by CR 6, but that procedural error was cured by petitioners' opportunity to be heard on this issue on November 23rd, 14 days after the matter was first noted. Petitioners never sought a continuance. Again compliance with the rule would have been preferable, but in this particular instance, no prejudice is shown when petitioners were given ample time to present countervailing arguments and affidavits.

The trial court correctly held that King County need not post a bond since RCW 4.92.080 exempts the state from posting a bond in any action. The prosecutor was proceeding under a state statute. The county is but an arm of the state. *State ex rel. Spokane v. DeGraff,* 143 Wash. 326, 255 P. 371 (1927). A statute essentially comparable to RCW 4.92.080 was construed in *State ex rel. Thrash v. Lamb,* 237 Mo. 437, 141 S.W. 665 (1911), to excuse the county prosecutor from posting a bond when proceeding on behalf of the state. It would be an anomaly to free the state from posting a bond while imposing such requirement upon its political subdivision whose life and authority derive from the state.

The petitioners next allege that the court exceeded its jurisdiction in finding Hargitt to be in contempt of court and, indeed, even in ordering him to appear personally. The show cause order did order Hargitt personally. When he failed to appear in person, the court entered a second order commanding appearance in person. While the court did enter a finding that Hargitt had defied these two orders, it stayed ruling upon the contempt issue and ordered Hargitt to appear within 30 days for discovery purposes. We need

not reach the issue of a contempt holding since the court delayed ruling on that point.

■ Any issue as to the validity and meaning of the show cause order was superseded by the specific order of November 10th, directing personal appearance. A superior court has inherent power to enter a conditional order as it did here after a violation of its earlier order. *Keller v. Keller*, 52 Wn.2d 84, 323 P.2d 231 (1958). Petitioners allege that the court's order denies them the rights given under CR 30, such as a motion to terminate or limit examination upon deposition. We do not read any such predetermination into the court's order. Rather it simply orders a defendant, who has twice failed to appear as ordered, to present himself for discovery. The court's order was entirely reasonable and preserves all of defendants' rights under regular discovery procedures.

■ The fifth major contention stems from the superior court's post-hearing order that:

> [D]efendants shall within 60 days from the date hereof or within 10 days before the final hearing of the merits of this cause, whichever period is shorter, cause the payment into this court of all sums of money collected from Washington residents for the purchase of franchises of Divorce, Inc., to be held pending further order of this court.

This, petitioners argue, is equivalent to imprisonment for debt in violation of Const. art. 1, § 17. However, cases involving imprisonment for debt such as *In re Van Alstine*, 21 Wash. 194, 57 P. 348 (1899), are inapposite here. The matter before us is not the potential contempt power of the court if the order is not obeyed, but rather the authority of the court to order such payment of funds.

CR 64 provides the superior courts with a broad array of provisional remedies for seizing persons or property:

> At the commencement of and during the course of an action, all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner

provided by the law existing at the time the remedy is sought. The remedies thus available include arrest, attachment, garnishment, replevin, sequestration, and other corresponding or equivalent remedies, however designated and regardless of whether the remedy is ancillary to an action or must be obtained by an independent action.

A superior court has the inherent power of sequestration to preserve property pending the outcome of the litigation and to aid the court in carrying into effect future orders in reference to that property. *Cf. Ippolito v. Ippolito*, 3 N.J. 561, 568-69, 71 A.2d 196 (1950). A strong showing is required to justify such drastic relief, and such a showing was made here.

The affidavits considered by the superior court allege payment of substantial sums to the defendants, portions in cash; they allege a scheme of advertising which, on its face, the court concluded to be in violation of a criminal statute, RCW 9.04.020; they allege representations and other actions which the court found to raise substantial questions under RCW 19.86, the Consumer Protection Act; they assert that defendants had collected $280,000 in franchise fees from Washington residents, and this was not contradicted in any of the three affidavits from the defendant Hargitt; and, they raise substantial questions about the reliability and responsibility of these defendants, including Hargitt's Canadian residence and his failure to appear in response to prior court orders. Upon this record, the sequestration of franchise fees collected by defendants from Washington residents, pending the outcome of this litigation, was within the discretion of the superior court.

■ The final question arises under the Consumer Protection Act, RCW 19.86, and is one of major importance and first impression in this state. Pursuant to RCW 19.86.090, plaintiff sought to enjoin the defendants from future violations of chapter 19.86. Defendants first argue that because plaintiff could be made whole by a money judgment, he lacks standing to enjoin further violations of the act.

RCW 19.86.090 provides that:

> *Any person* who is injured in his business or property by a violation of RCW 19.86.020, 19.86.030, 19.86.040, 19.86.050, or 19.86.060 . . . *may bring a civil action in the superior court to enjoin further violations, to recover the actual damages sustained by him, or both,* together with the costs of the suit, including a reasonable attorney's fee, and the court may in its discretion, increase the award of damages to an amount not to exceed three times the actual damages sustained . . .

(Italics ours.)

By the very language of the statute, plaintiff may obtain injunctive relief in addition to recovering actual damages. However, defendants further argue that plaintiff may enjoin future violations only as to himself, thus protecting his own interests, but that he may not protect the public interest as well. Such a constriction of the scope of injunctive relief provided to the individual by RCW 19.86.090 is inconsistent with both the language of that section and the spirit and purpose of the Consumer Protection Act.

RCW 19.86.090 authorizes an injured person to recover only the "actual damages sustained by him," but imposes no such limitation upon injunctive relief. Had the legislature desired to so limit the injunction they could have easily done so, as they did with damages.

Our interpretation is strengthened by RCW 19.86.920, which declares:

> [T]he purpose of this [consumer protection] act is . . . to protect the public and foster fair and honest competition. . . . To this end this act shall be liberally construed that its beneficial purposes may be served.

This broad public policy is best served by permitting an injured individual to enjoin future violations of RCW 19.86, even if such violations would not directly affect the individual's own private rights.

If each consumer victim were limited to injunctive relief tailored to his own individual interest, the fraudulent practices might well continue unchecked while a multiplicity of suits developed. On the other hand, if a single litigant is

allowed to represent the public and consumer fraud is proven, the multiplicity of suits is avoided and the illegal scheme brought to a halt. Both results are in the public interest and consistent with the liberal construction of our Consumer Protection Act. Indeed, in many private consumer protection cases the damage has already been done to the particular individual plaintiff at the time the law suit is filed, making ineffectual an injunction limited solely to the protection of the individual plaintiff.

Much attention has been focused on the inadequacy of remedies in the consumer protection field, whether individual or governmental. *See* Travers and Landers, *The Consumer Class Action,* 18 U. Kan. L. Rev. 811 (1970); Rice, *Uniform Consumer Sales Practices Act—Damages Remedies,* 67 Nw. U.L. Rev. 369 (1972); *Private Remedies Under the Consumer Fraud Acts,* 67 Nw. U.L. Rev. 413 (1972). The necessity for broadened private remedies is recognized in *Rice v. Snarlin, Inc.,* 131 Ill. App. 2d 434, 266 N.E.2d 183 (1970), and *Vasquez v. Superior Court,* 4 Cal. 3d 800, 484 P.2d 964, 94 Cal. Rptr. 796 (1971).

We hold that under RCW 19.86.090 an individual may seek and obtain an injunction that would, besides protecting his own interests, protect the public interest.

We emphasize that we have not reached the substantive merits of any of the issues, but rather conclude that the trial court acted within its discretion and authority with respect to each of the foregoing matters.

HALE, C.J., FINLEY, ROSELLINI, HUNTER, HAMILTON, STAFFORD, WRIGHT, and UTTER, JJ., concur.